UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WAYNE CHRISTOPHER WHITE,

                        Plaintiff,

            -v-

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

CIVIL ACTION NO.: 20 Civ. 6222 (SLC)

**OPINION & ORDER**

**SARAH L. CAVE**, United States Magistrate Judge.

## I.      INTRODUCTION

Plaintiff Wayne Christopher White ("Mr. White"), commenced this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. § 405(g), seeking review of the decision by the Commissioner (the "Commissioner") of the Social Security Administration ("SSA"), denying his application for Supplemental Security Income ("SSI") under the Act.  The parties have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  For the reasons set forth below, Mr. White's Motion (ECF No. 14) is GRANTED and the Commissioner's Motion (ECF No. 17) is DENIED.

## II.      BACKGROUND

### A.  Historical Background

Mr. White has a history of schizophrenia and bipolar disorder dating at least to August 26, 2011, when he was admitted to the psychiatric unit at Elmhurst Hospital.  (Certified Administrative Record ("R.") 508).  He was also hospitalized at Harlem Hospital from December 6 to December 14, 2011, at Queens Hospital on August 31, 2013, at Mount Sinai Hospital from

1

September 16 to 22, 2014, and at Metropolitan Hospital on November 12, 2013 and February 25 through 27, 2015.  (R. 508).  He also received outpatient psychiatric treatment in August and September 2013 for unspecified episodic mood disorder and other schizophrenic disorders at Care Coordination and Upper Room Ministry.  (R. 508).

From March 15, 1988 to February 14, 1990, Mr. White was in the infantry in the United States Army, from which he received an other than honorable discharge following a court martial on charges that he was absent without leave.  (R. 50, 53, 82, 84–85, 99, 104, 412, 419, 553, 877, 1006).[1]

Following a September 2015 arrest and subsequent conviction for third degree robbery, Mr. White began a two-to-four year term of New York State incarceration, of which he ultimately served two years and eight months.  (R. 508, 515).  During his pre-trial detention at Riker's Island, Mr. White began mental health treatment, was diagnosed with Residual Schizophrenia, and prescribed a dosage of 10mg of Ablify.  (R. 508).  For the ten years before this arrest, Mr. White had received SSI benefits based on his psychiatric conditions, but the benefits stopped once he was incarcerated.  (R. 83, 508).

On March 20, 2018, Mr. White was discharged from the Community Oriented Re-entry Program at Sing Sing Correctional Facility ("CORP").  (R. 509).  In a Discharge Summary, Jacqueline Kaufman, LMSW2, and Margaret Fraser, Psy.D., stated that Mr. White's diagnosis was: (i) Schizoaffective Disorder, Bipolar type; (ii) Alcohol use Disorder, mild; and (iii) Cannabis Use disorder, mild, and noted that he was prescribed a dosage of 20mg of Ablify.  (R. 509, 511).  The Discharge Summary recommended that Mr. White continue his medication, day treatment, and

---

[1] The Court expresses gratitude to Mr. White for his military service.

2

psychiatric care.  (R. 511).  The mental status examination by Ms. Kaufman and Dr. Fraser noted

that Mr. White was well-groomed, had normal speech, "fine" mood and affect, average IQ, and

good insight and judgment.  (R. 511).  The Discharge Summary concluded that Mr. White

> has maintained emotional stability in the CORP program with good attendance
> and participation.  He is medication compliant.  He is cooperative with staff and
> has good relationships with peers.  He is capable of living independently, [and]
> following a budgetary plan.  He can cook and clean without supervision.  He is not
> a danger to self or other[s].  He has demonstrated a positive attitude towards his
> release and voices a willingness to engage in treatment when he is released into
> the community.

(R. 511).

### B.  Administrative Proceedings

On April 13, 2018, Mr. White filed an application for SSI benefits (the "Application"),

alleging a disability based on anemia, antisocial personality disorder, mental disorders,

schizophrenic disorder, learning difficulties, obesity, chest pain, and lumbago.  (R. 203–10, 246,

251).  On June 27, 2018, the SSA denied the Application.  (R. 111–15).  Mr. White appealed and

requested a hearing before an ALJ.  (R. 117–30).  On May 6, 2019, ALJ Gloria Pellegrino held a

hearing (the "ALJ Hearing"), at which Mr. White, who was represented by counsel, appeared and

testified.  (R. 76–94, 148).  Yaakov Taitz, Ph.D., an impartial vocational expert ("VE"), also

appeared at the ALJ Hearing.  (R. 76-77, 90–93).

### C.  The ALJ Decision

On June 5, 2019, ALJ Pellegrino issued a decision denying Mr. White's Application for SSI

benefits (the "ALJ Decision").  (R. 11–19).  At steps one and two of the five-step disability

determination process, the ALJ found that Mr. White had not engaged in substantial gainful

activity since April 13, 2018 (the date he filed his Application), and that his schizophrenia, bipolar

disorder, depression, substance abuse disorder, and obesity were severe impairments as defined under the Act.  (R. 13).

At step three, the ALJ found that Mr. White did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926) (the "Listings").  (R. 13–14).  The ALJ then found that Mr. White had the residual functional capacity ("RFC") to "perform a full range of work at all exertional levels" with the non-exertional limitation that he be "limited to simple, routine and repetitive tasks and occasional contact with the public." (R. 14).  Next, the ALJ found that Mr. White had no past relevant work, and considering his age (47 at the time of the ALJ Hearing), high school education, ability to communicate in English, and his RFC, that "there are jobs that exist in significant numbers in the national economy that [he] can perform."  (R. 18).  Based on the VE's testimony, ALJ Pellegrino concluded that these jobs included hand packager (Dictionary of Occupational Titles ("DOT") code 920.587-018, of which there are 90,000 jobs nationally), cleaner (DOT code 381.687-018, of which there are 100,000 jobs nationally), and price marker (DOT code 209.587-034, of which there are 300,000 jobs nationally).  (R. 18–19).

Accordingly, the ALJ found that Mr. White had not been disabled and was not entitled to SSI benefits for the period April 13, 2018 to June 5, 2019.  (R. 19).  On July 1, 2020, the Appeals Council denied Mr. White's request for review, making the ALJ Decision the final decision of the Commissioner.  (R. 1-7).

### D.  **Procedural History**

On August 7, 2020, Mr. White, through counsel, filed the Complaint in this action seeking review of the ALJ Decision.  (ECF No. 1).  On May 12, 2021, Mr. White filed his Motion, on July 12, 2021, the Commissioner filed her Motion, and on August 2, 2021, Mr. White filed a reply.  (ECF Nos. 14-15, 17, 17-1, 18).  On January 14, 2022, the parties consented to jurisdiction by a United States Magistrate Judge for all purposes.  (ECF No. 20).

### III.    **LEGAL STANDARDS**

### A.  **Standard of Review**

Under Rule 12(c), a party is entitled to judgment on the pleadings if he establishes that no material facts are in dispute and that he is entitled to judgment as a matter of law.  See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743 (RCC) (FM), 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."   42 U.S.C. § 405(g).  A court may set aside the Commissioner's decision denying SSI benefits if it is not supported by substantial evidence or was based on legal error.  See Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).  Judicial review, therefore, involves two levels of inquiry.  First, the Court must decide whether the ALJ applied the correct legal standard.  See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254 (SCR) (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008).  Second, the Court must decide whether the ALJ's decision was supported by substantial evidence.  Id.  "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the

evidence must also include that which detracts from its weight." Longbardi v. Astrue, No. 07 Civ. 5952 (LAP), 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted).  The substantial evidence test applies not only to the factual findings, but also to the inferences and conclusions drawn from those facts. See, e.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).  In determining whether the administrative record contains evidence to support the denial of claims, the Court must consider the whole record, and weigh all evidence to ensure that the ALJ evaluated the claim fairly. See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).  The Commissioner, not the Court, resolves evidentiary conflicts and appraises the credibility of witnesses, including the claimant. See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Disability-benefits proceedings are non-adversarial in nature, and therefore, the ALJ has an affirmative obligation to develop a complete administrative record, even when the claimant is represented by counsel. See Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508–09 (2d Cir. 2009). To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from her medical sources.  20 C.F.R. §§ 404.1512(b), 416.912(b).  Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity." Casino-Ortiz v. Astrue, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007).  When there are inconsistencies, gaps, or ambiguities in the record, the regulations give the ALJ options to collect evidence to resolve these issues,

including re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others. 20 C.F.R. §§ 404.1520b, 416.920b.

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see Butts v. Barnhart, 388 F.3d 377, 382 (2d Cir. 2004). If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the Court will remand the case for further development of the evidence or for more specific findings. Rosa, 168 F.3d at 82–83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)). Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000)).

### B.  Standards for Benefit Eligibility

For purposes of SSI benefits, one is "disabled" within the meaning of the Act, and thus entitled to such benefits, when she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). The Act also requires that the impairment be "of such severity that [the claimant] is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(3)(B).  In reviewing a claim of disability, the Commissioner must consider:  "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988).

Under the applicable regulations, an alleged disability is evaluated under the sequential five-step process set forth in 20 C.F.R. § 416.920(a)(4)(i)–(v).  The Second Circuit has described the process as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity.  If not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on the medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the Claimant could perform.

Bush v. Shalala, 94 F. 3d 40, 44–45 (2d Cir. 1996) (quoting Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983)).

At the first four steps, the claimant bears the burden of proof; the burden shifts to the Commissioner are step five.  See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).  At step five, the Commissioner determines whether the claimant can perform work that exists in

significant numbers in the national economy.  See Butts v. Barnhart, 416 F.3d 101, 103 (2d Cir.

2005); 20 C.F.R. §§ 416.920(a)(4)(v), 416.960(c).

### C.  Evaluation of Medical Opinion Evidence

For benefits applications filed before March 27, 2017, the SSA's regulations required an

ALJ to give more weight to those physicians with the most significant relationship with the

claimant.  See 20 C.F.R. § 416.927; see also Taylor v. Barnhart, 117 F. App'x 139, 140 (2d Cir.

2004).  Under this "Treating Physician Rule," an ALJ was required to "give good reasons" Kevin E.

v. Comm'r of Soc. Sec., No. 1:19-CV-593 (EAW), 2021 WL 1100362, at *4 (W.D.N.Y. Mar. 23, 2021)

(quoting former 20 C.F.R. § 404.1527(c)(2)), if he or she determined that a treating physician's

opinion was not entitled to "controlling weight," or, at least, "greater weight" than the opinions

of non-treating and non-examining sources.  Gonzalez v. Apfel, 113 F. Supp. 2d 580, 588–89

(S.D.N.Y. 2000).  In addition, under the Treating Physician Rule, a consultative physician's opinion

was generally entitled to "little weight."  Giddings v. Astrue, 333 F. App'x 649, 652 (2d Cir. 2009).

On January 18, 2017, the SSA published comprehensive revisions to the regulations

regarding the evaluation of medical evidence, revisions that were applicable to applications filed

on or after March 27, 2017.  See Revisions to Rules Regarding the Evaluation of Medical Evidence,

82 F. R. 5844-01, 2017 WL 168819 (Jan. 18, 2017).  These new regulations reflect a departure

from a perceived hierarchy of medical sources.  See id.  The regulations now provide that an ALJ

need "not defer or give any specific evidentiary weight, including controlling weight, to any

medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's]

medical sources."[2]  20 C.F.R. § 416.920c(a).  See Young, 2021 WL 4148733, at *9.  Instead, an ALJ

---

[2] The new regulations define "prior administrative medical finding" as:

must consider all medical opinions in the record and "evaluate the persuasiveness" based on five "factors": (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) any "other" factor that "tend[s] to support or contradict a medical opinion."   20 C.F.R. § 416.920c(a)–(c)(1)–(5).

The ALJ's duty to articulate a rationale for each factor varies.   20 C.F.R. § 416.1520c(a)–(b).   Under the new regulations, the ALJ must "explain," in all cases, "how [he or she] considered" both the supportability and consistency factors, as they are "the most important factors."   Id. § 416.920c(b)(2); see Young, 2021 WL 4148733, at *9 (describing supportability and consistency as "the most important" of the five factors); Amber H. v. Saul, No. 3:20-CV-490 (ATB), 2021 WL 2076219, at *4 (N.D.N.Y. May 24, 2021) (noting that the two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," the "same factors" on which the Treating Physician Rule was based); Rivera, 2020 WL 8167136, at *13 (explaining that supportability and consistency are the "most important" factors under 20 C.F.R. § 416.920c(c)).   As to supportability, "the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase."   Vellone v. Saul, No. 20 Civ. 261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29,

---

[A] finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record, such as: (i) The existence and severity of your impairment(s); (ii) The existence and severity of your symptoms; (iii) Statements about whether your impairment(s) meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1; (iv) If you are a child, statements about whether your impairment(s) functionally equals the listings in Part 404, Subpart P, Appendix 1; (v) If you are an adult, your [RFC]; (vi) Whether your impairment(s) meets the duration requirement; and (vii) How failure to follow prescribed treatment (see § 416.930) and drug addiction and alcoholism (see § 416.935) relate to your claim.

20 C.F.R. § 416.913(a)(5).

2021) (citing 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1)); see Rivera, 2020 WL 8167136, at *16 (noting that supportability "has to do with the fit between the medical opinion offered by the source and the underlying evidence and explanations 'presented' by that source to support [his or] her opinion") (quoting 20 C.F.R. § 416.920c(c)(1)).  Consistency "is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." Vellone, 2021 WL 319354, at *6.

As to the three remaining factors—relationship with the claimant, specialization, and "other"—the ALJ is required to consider, but need not explicitly discuss, them in determining the persuasiveness of the opinion of a medical source.  20 C.F.R. § 416.920c(b)(2).  If the ALJ finds two or more medical opinions to be equally supported and consistent with the record, but not identical, the ALJ must articulate how he or she considered those three remaining factors.  See id. § 416.920c(b)(3).

Thus, "[a]lthough the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning 'weight' to a medication opinion, the ALJ must still 'articulate how [he or she] considered the medical opinions' and 'how persuasive [he or she] find[s] all of the medical opinions.'"  Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020) (quoting 20 C.F.R. §§ 416.920c(a), (b)(1)).  "The ALJ need not discuss all of the factors described in the regulations but must, as to each opinion or prior administrative medical finding, 'explain how [he or she] considered the supportability and consistency factors."  Rivera, 2020 WL 8167136, at *14 (quoting 20 C.F.R. § 416.920c(b)(2)).  "If the ALJ fails adequately to 'explain the supportability or

consistency factors,' or bases [his] explanation upon a misreading of the record, remand is required." Id. (quoting Andrew G., 2020 WL 5848776, at *9)).

District courts in this Circuit have "upheld the validity of the Commissioner's elimination of the treating physician rule and implementation of the new regulations." Tasha W. v. Comm'r of Soc. Sec., No. 3:20-CV-731 (TWD), 2021 WL 2952867, at *6 (N.D.N.Y. July 14, 2021) (collecting cases). Nevertheless, "the new [r]egulations do not amount to much of a change in terms of the analysis itself." Amanda R. v. Comm'r of Soc. Sec., No. 6:20-CV-596, 2021 WL 3629161, at *6 (N.D.N.Y. Aug. 17, 2021). As several District Courts within the Second Circuit applying the new regulations have concluded, "the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar" to the former Treating Physician Rule. Acosto Cuevas v. Comm'r of Soc. Sec., No. 20 Civ. 502 (AJN) (KHP), 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021) (surveying district court cases in the Second Circuit considering the new regulations); see Prieto v. Comm'r of Soc. Sec., No. 20 Civ. 3941 (RWL), 2021 WL 3475625, at *9 (S.D.N.Y. Aug. 6, 2021) (noting that under both the Treating Physician Rule and the new regulations, "an ALJ's failure to properly consider and apply the requisite factors is grounds for remand"); Dany Z. v. Saul, No. 2:19-CV-217 (WKS), 2021 WL 1232641, at *12 (D. Vt. Mar. 31, 2021) (surveying Second Circuit district courts that "have concluded that the factors are very similar to the analysis under the old [Treating Physician] [R]ule"); Andrew G., 2020 WL 5848776, at *5 (noting that "consistency and supportability" were "the foundation of the treating source rule"); see also Brianne S. v. Comm'r of Soc. Sec., No. 19-CV-1718 (FPG), 2021 WL 856909, at *5 (W.D.N.Y. Mar. 8, 2021) (remanding to ALJ with instructions to provide explicit discussion of supportability and consistency of two medical opinions, because ALJ's "mere[] state[ment]"

that examining physician's opinion was not consistent with overall medical evidence was insufficient).

### D.  **The Claimant's Credibility**

In considering a claimant's symptoms that allegedly limit his ability to work, the ALJ must first determine "whether there is an underlying medically determinable physical or mental impairment(s) —i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques — that could reasonably be expected to produce the claimant's pain or other symptoms." 20 C.F.R. § 416.929(c).  If such an impairment is found, the ALJ must next evaluate the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations."   20 C.F.R. § 416.929(c)(1).  To the extent that the claimant's expressed symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the claimant's credibility.  See Meadors v. Astrue, 370 F. App'x 179, 183–84 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350–51 (2d Cir. 2003).

Courts have recognized that "the second stage of [the] analysis may itself involve two parts."  Sanchez v. Astrue, No. 07 Civ. 931 (DAB), 2010 WL 101501, at *14 (S.D.N.Y. Jan. 12, 2010). "First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of the alleged symptoms (as opposed to the question in the first step of whether objective evidence establishes a condition that could 'reasonably be expected' to produce such symptoms)."   Id. "Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged symptoms by reference to the seven factors listed [in 20 C.F.R. § 416.929(c)(3)]."   Id. (citing

Gittens v. Astrue, No. 07 Civ. 1397 (GAY), 2008 WL 2787723, at *5 (S.D.N.Y. June 23, 2008)).  If the ALJ does not follow these steps, remand is appropriate.  Id. at *15.

When a claimant reports symptoms that are more severe than medical evidence alone would suggest, SSA regulations require the reviewing ALJ to consider specific factors in determining the credibility of the claimant's symptoms and their limiting effects.  SSR 96-7p, 1996 WL 374186, at *2 (superseded by SSR 16-3p for cases filed after March 27, 2017).  These seven factors include:  (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  See Bush, 94 F.3d at 46 n.4.

## IV.   DISCUSSION

Mr. White advances two arguments in support of his request for reversal of the ALJ Decision.  First, Mr. White argues that the ALJ failed to evaluate properly the medical opinion evidence.  (ECF No. 15 at 15–25).  Second, he argues that the ALJ failed to evaluate properly his subjective statements about his conditions.  (ECF No. 15- at 25–27).  The Court addresses both arguments in turn.

### A. **Medical Opinion Evidence**

Mr. White challenges the ALJ's supposed failure to appreciate the requirements of the new regulations, which supplant the former Treating Physician Rule, in considering the medical opinion evidence.  (See § III.C, supra).  Here, the ALJ found highly persuasive a non-examining state agency review physician, but discounted the opinions of two treating providers, one examining provider, and one consultative examiner.  The Court summarizes these medical opinions and then assesses whether the ALJ applied and properly explained her approach as to the supportability and consistency factors for each opinion.  See, e.g., Ingrid T.G. v. Comm'r of Soc. Sec., No. 20 Civ. 5651 (GRJ), 2022 WL 683034, at *4 (S.D.N.Y. Mar. 8, 2022).

### 1. **Elizabeth Cahn, N.P.**

On August 1, 2018, Elizabeth Cahn, a Nurse Practitioner specializing in psychiatry at the OASAS Rehabilitation Program, examined Mr. White and completed a psychiatric/psychological impairment questionnaire (the "2018 Questionnaire") as he began the OASAS program.  (R. 870–74, 916–17).  Ms. Cahn did not have Mr. White's prior records, and based her answers on her interview of Mr. White.  (R. 874). Ms. Cahn noted Mr. White's diagnoses of schizophrenia and schizoaffective disorder, his prescription for Ablify 20mg, and his history of psychiatric hospitalization.  (R. 870, 872).  In her mental status examination, Ms. Cahn noted that Mr. White had: a depressed mood; persistent or generalized anxiety; an irritable affect; difficulty thinking or concentrating; poor immediate memory; pathological dependence, passivity, or aggressiveness; agitation; slowed speech; and a pattern of napping during the day.  (R. 871).  She assessed that he had: marked limitations in remembering locations and work-like procedures and in understanding and remembering detailed instructions; moderate-to-marked limitations in

carrying out detailed instructions, maintaining attention and concentration for extended periods, completing a workday without interruptions from his psychological symptoms, and performing at a consistent pace; and moderate limitations in understanding and remembering one-to-two step instructions, carrying out simple one-to-two step instructions, making simple work-related decisions, interacting appropriately with the public, accepting instructions and responding appropriately to criticism from supervisors, and responding appropriately to workplace changes. (R. 873).  Ms. Cahn noted that other work-related limitations included constant lateness and not planning daily routines.  (R. 874).  Ms. Cahn anticipated that Mr. White was likely to be absent from work more than three times per month.  (R. 874).

The ALJ found Ms. Cahn's opinion not persuasive because it was based on her interview of Mr. White and therefore his "subjective narrative," rather than on longitudinal evidence. (R. 17 (citing R. 874)).  The ALJ found her opinion that he would be absent from work more than three times per month inconsistent with her conclusion that Mr. White had no or mild limitation in his ability to sustain an ordinary routine, perform activities within a schedule, and consistently be punctual.  (R. 17; see R. 873–74).  The ALJ noted that the record showed that Mr. White "had good attendance."  (R. 17).  Finally, the ALJ concluded that Ms. Cahn "seem[ed] to overstate the degree of [Mr. White]'s limitations, which is inconsistent with the many largely normal mental status examination findings throughout the medical evidence of record."  (R. 17).

### 2.    Shoshannah Pearlman, D.N.P.

On March 16, 2019, Shoshannah Pearlman, D.N.P., of BAVR, completed a psychiatric/psychological impairment questionnaire (the "2019 Questionnaire"), which referenced an attached psychiatric evaluation dated January 12, 2019 (the "January 2019

Evaluation"). (R. 924–28; 919–21). Ms. Pearlman noted in the 2019 Questionnaire that she had been seeing Mr. White monthly since June 14, 2018. (R. 924). She referenced the January 2019 Evaluation, in which Mr. White's diagnosis was disorganized type schizophrenia, for which he was then prescribed 30mg of Ablify daily. (R. 924; see R. 921).

Ms. Pearlman's mental status examination in the 2019 Questionnaire noted that Mr. White had persistent or generalized anxiety, flat affect, hostility or irritability, illogical thinking, rigid thought, difficulty thinking or concentrating, poor remote memory, paranoia, persistent irrational fears, vigilance, deeply ingrained maladaptive patterns of behavior, pathological dependence, passivity, or aggressiveness, delusions, and insomnia. (R. 925). Ms. Pearlman assessed that Mr. White had: marked limitation in understanding and remembering detailed instructions; carrying out detailed instructions, maintaining attention and concentration for extended periods; working in coordination with others without being distracted by them, completing a workday without interruption from psychological symptoms, interacting appropriately with the public, and responding appropriately to workplace changes; moderate-to-marked limitation in sustaining an ordinary routine without supervision, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers without distracting them, maintaining socially appropriate behavior, and setting realistic goals; and moderate limitations in understanding and remembering one-to-two step instructions, carrying out simple one-to-two step instructions, performing activities within a schedule and consistently being punctual, making simple work-related decisions, performing at a consistent pace without unreasonable rest periods, asking simple questions or requesting assistance, and making plans independently. (R. 927). The only areas in which Ms. Pearlman assessed none-to-mild limitations

were remembering locations and work-like procedures, adhering to basic standards of neatness, being aware of hazards and taking appropriate precautions, and traveling to unfamiliar places or using public transportation.  (R. 927).  Ms. Pearlman anticipated that Mr. White would be absent from work more than three times per month, and that her objective findings were reasonably consistent with Mr. White's symptoms and functional limitations.  (R. 928).

In the annexed January Evaluation, Ms. Pearlman noted that Mr. White was meeting with her that day to request a renewal of his Ablify prescription "and to request a letter so he can have his psychiatric level of care with the [New York State Department of Corrections ("DOC")] reduced."  (R. 919).  Mr. White explained to Ms. Pearlman that he felt he was wrongfully convicted of robbery, and that he was unfairly "given a high level of psychiatric risk in the DOC system."  (R. 919).  Mr. White told her he planned to meet with his probation officer "to advocate for himself to have the [high risk] label removed."  (R. 919).

The ALJ found Ms. Pearlman's opinion "only somewhat persuasive."  (R. 17).  The ALJ found that "her opinion support[ed] the conclusion that [Mr. White] is capable of performing simple, routine and repetitive work."  (R. 17).  Like with Ms. Cahn, the ALJ found that the record did not support Ms. Pearlman's opinion that Mr. White would likely miss work more than three times per month, "considering the totality of the evidence, including longitudinal treatment notes."  (R. 17).

### 3.    Toula Georgiou, Psy.D.

On June 6, 2018, psychiatric consultative examiner Toula Georgiou, Psy.D., examined Mr. White.  (R. 552–54).  Dr. Georgiou noted that Mr. White had traveled over an hour by train from the shelter where he resided.  (R. 552).  Dr. Georgiou noted that Mr. White had been in

special education in grade school, and had been hospitalized "4 to 5 times" before 2014 for depression and auditory hallucinations. (R. 552). Dr. Georgiou's mental status examination found that Mr. White was cooperative, casually dressed, and restless, his speech was monotonous, his thought process was coherent and goal directed, his affect was flat, his mood was neutral, his attention and concentration were mildly impaired, his memory skills were mildly to moderately impaired, his cognitive functioning was below average, and his insight and judgment were fair. (R. 553). Dr. Georgiou opined that Mr. White "may have difficulties regulating his emotions, maintaining a regular work schedule, working at a consistent pace, and having to interact with others due to psychiatric issues." (R. 553–54). Dr. Georgiou concluded that "[t]he results of the present evaluation appear to be consistent with psychiatric difficulties, and this may significantly interfere with [Mr. White's] ability to function on a daily basis." (R. 554). Dr. Georgiou diagnosed Mr. White as having Schizoaffective disorder, and recommended psychiatric and psychological treatment, with a fair prognosis. (R. 554).

The ALJ found Dr. Georgiou's opinion "only somewhat persuasive," because it was "somewhat consistent with the record and Dr. Georgiou's examination findings but vague and heavily reliant on the claimant's subjective narrative of his limitations." (R. 16).

### 4. Lavonna Branker, M.D.

On May 17, 2018, Lavonna Branker, M.D., of Fedcap,[3] met with Mr. White and prepared a biopsychosocial summary. (R. 512–51; 955–92). Dr. Branker reviewed Mr. White's medical

---

[3] Fedcap is a not-for-profit organization that creates work opportunities for people with barriers to economic well-being. See FEDCAP, https://www.fedcap.org/about-us/#mission (last visited Mar. 30, 2022). It offers educational and vocational rehabilitation programs, and facilitates employment placement in facilities management positions. See Educational Services, FEDCAP,

records dating back to 2005, and observed prior diagnoses of schizoaffective disorder, bipolar disorder, adjustment reaction with mixed anxiety and depressed mood, for which he had been hospitalized four times, the last in 2013.  (R. 528, 531).  Dr. Branker noted that Mr. White reported experiencing auditory hallucinations three days prior.  (R. 531).  In assessing Mr. White's work limitations, Dr. Branker noted that Mr. White spoke in monosyllables, had trouble reading and writing, had trouble understanding simple questions, had limited sustained concentration and attention, had borderline intellectual functioning, had decreased tolerance for mental stress and limited adaptability to change, had a maladaptive personality, and was angry, argumentative, and paranoid.  (R. 542–43).  Dr. Branker recommended the following non-exertional work accommodations for Mr. White: increased supervision including regular meetings, reviewing instructions, and providing feedback; low stress environment; working alone with minimal stimuli and additional training time.  (R. 544).

Dr. Branker referred Mr. White for a psychiatric consult (R. 541), which Veena Garyali, M.D., also of Fedcap, performed on May 17, 2018.  (R. 995–1003).  Dr. Garyali noted Mr. White's 2005 medical records and a May 11, 2018 diagnosis of schizoaffective disorder, bipolar type. (R. 995–96).  Dr. Garyali noted that Mr. White "became very irate" in response to her questions, and was "uncooperative, argumentative, and angry."  (R. 997).  Dr. Garyali also noted Mr. White's four prior psychiatric hospitalizations, history of visual hallucinations, and past assaults "because of his delusional thoughts."  (R. 997).  In her mental status examination, Dr. Garyali described Mr. White as casual, alert, and uncooperative, and as exhibiting a blunted affect, irritable mood,

---

https://www.fedcap.org/business-solutions/; https://www.fedcap.org/educational-services/ (last visited Mar. 30, 2022).

coherent speech, poor insight, limited judgment, and poor impulse control.   (R. 997–98).
Although noting that Mr. White had experienced cognitive problems since childhood and limited
concentration (R. 997), Dr. Garyali  reported that he "did not answer many questions because he
said he could not remember," although it was "hard to tell whether there is any organic problem
or this was an excuse not to answer questions."  (R. 998).  Dr. Garyali concluded that Mr. White
was "unable to work" because he did "not seem to be stable," "has not ever worked for any
length of time and is still psychotic."  (R. 1002–03).  She expected that "his chances of being able
to work are nil."  (R. 1003).

After  reviewing  Dr. Garyali's  findings,  Dr.  Branker  also  concluded  that  Mr.  White
presented with a chronic affective and delusional psychiatric disorder.  (R. 550).  Noting his
limited work history, learning disability, and "maladaptive personality," Dr. Branker opined that
it was "unlikely that he will stabilize sufficiently for employment [within] the next year."  (R. 550).

The ALJ found that Dr. Branker's opinion was not persuasive because it was "conclusory
and not well supported by examination findings or consistent with the overall medical evidence
of record discussed above."  (R. 18).

### 5.      State Agency Consultant C. Walker

In June 2018, non-examining State Agency review physician C. Walker, Ph.D., reviewed
certain of Mr. White's medical records and provided an assessment of Mr. White's RFC.  (R. 95–
106).  The records that Dr. Walker reviewed included Dr. Georgiou's opinion, hospitalization
records from Mount Sinai and from Metropolitan Hospital, and evidence that Mr. White had
submitted, but did not include records from Mr. White's hospitalization at Queens Hospital or his

treatment records from "The Bridges Pros" that had been requested but not received.  (R. 97–98).

Dr. Walker concluded that Mr. White had moderate limitations in his abilities to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; work in coordination or proximity to others without being distracted by them; complete a normal workday and workweek without interruption from psychological symptoms and perform at a consistent pace without unreasonable rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make independent plans.  (R. 102–03).

Dr. Walker opined that Mr. White was not significantly limited in his abilities to: remember locations and work-like procedures; understand and remember short and simple instructions; carry out short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and travel in unfamiliar places or use public transportation.  (R. 102-103).  He deemed Mr. White to have no limitation in the ability to be aware of normal hazards and take appropriate precautions.  (R. 103).

Dr. Walker concluded that the medical evidence supported "the presence of severe psychiatric impairments that result[] in more than minimal functional limitations[,]" but that,

even with these impairments, Mr. White could remember and understand simple instructions and procedures, and complete an ordinary work day and work week for simple tasks but had some difficulty in carrying out complex tasks. (R. 104). Dr. Walker noted that Mr. White "would benefit from a work setting with limited contact with co-workers and the [] general public[,]" but could handle "routine actions with coworkers and supervisors." (R. 104). Dr. Walker concluded that Mr. White was "limited to simple/unskilled work activity." (R. 106).

The ALJ found that Dr. Walker's opinion was "highly persuasive" and "supported by a review of [Mr. White's] longitudinal psychiatric treatment and consistent with the totality of the objective evidence in the file." (R. 17–18).

### 6.    Analysis

In this case, after determining that the medical opinions of all the experts who treated or examined Mr. White were not persuasive, in whole or in part, due to vagueness, inconsistencies with the treatment record or examination findings, or lack of corroboration, the ALJ determined that the only "highly persuasive" opinion was that of the non-examining consultative expert. (R. 16–18). For the following reasons, the Court finds that the ALJ's assessment of the medical opinion evidence was not supported by substantial evidence or consistent with applicable law.

First, given Mr. White's mental impairments, the ALJ was obligated to exercise particular caution in evaluating the medical opinion evidence. The Second Circuit's caution against an ALJ's heavy reliance on the opinions of consultative experts after a single—or in this case, no— examination "is even more pronounced in the context of mental illness where . . . a one-time snapshot of a claimant's status may not be indicative of [his] longitudinal mental health" or fluctuating symptoms. Estrella v. Berryhill, 925 F.3d 90, 98 (2d Cir. 2019); see Ferraro v. Saul, 806

F. App'x 13, 16 (2d Cir. 2020) (reiterating concern that ALJ's heavy reliance on consultative experts who only conducted single examination is "'even more pronounced in the context of mental illness'") (quoting Estrella, 925 F.3d at 98); Jennifer E. v. Comm'r of Soc. Sec., No. 3:19-CV-321 (ATB), 2020 WL 2059823, at *8 (N.D.N.Y. Apr. 29, 2020) (explaining that "Estrella and its progeny reflect the Second Circuit's judgment that the opinions of treating providers are entitled to even more deference when they relate to a Plaintiff with mental health limitations").  Here, the ALJ did not heed that caution, which was particularly egregious given that Dr. Walker did not possess, let alone review, the complete set of hospitalization and treatment records that had been requested for Mr. White, and that Mr. White had previously been ruled disabled for SSI purposes.  (R. 83, 97–98).  See McGlothlin v. Berryhill, No. 1:17-CV-776 (MAT), 2019 WL 1499140, at *4-5 (W.D.N.Y. Apr. 4, 2019) (remanding where ALJ relied on "stale" consultative examination that was "unable to serve as substantial evidence"); Hooper v. Colvin, 199 F. Supp. 3d 796, 815 (S.D.N.Y. 2016) (remanding where ALJ made disability determination based on incomplete medical opinions).

Second, the ALJ erred in rejecting Ms. Cahn's opinion for her reliance on Mr. White's "subjective narrative."  (R. 16–17).  "[C]ourts in this Circuit have observed that it is axiomatic that in diagnosing a mental disorder, a treating psychiatrist must consider a patient's subjective complaints."  Anauo v. Colvin, No. 1:15-CV-933 (MAT), 2016 WL 7320068, at *6 (W.D.N.Y. Dec. 16, 2016) (emphasis added) (citation omitted).  The Court cannot fathom what a psychiatric provider, such as the nurse practitioner here, could be "expected to do . . . other than to review the patient's history, conduct a mental status examination, and to report the results and recommendations regarding the patient's ability to function."  Lopez-Tiru v. Astrue, No. 09-CV-

1638 (ARR), 2011 WL 1748515, at *4 (E.D.N.Y. May 5, 2011).  To the extent, then, that the ALJ found that Ms. Cahn's opinion insufficiently supported by her own narrative or other detailed findings, "the ALJ had a duty to develop the record and resolve [any] obvious gaps."  Lebby v. Comm'r of Soc. Sec., No. 20-CV-4760 (PKC), 2022 WL 580983, at *6 (E.D.N.Y. Feb. 24, 2022); see McGill v. Saul, No. 18-CV-6430 (PKC), 2020 WL 729774, at *4 (E.D.N.Y. Feb. 13, 2020) (holding that, where "the ALJ deemed the treating physicians' opinions lacking in support, the ALJ should have sought clarification from them regarding the deficiencies she perceived in their opinions[,]" rather than discounting them altogether).

Third, the ALJ also erred in failing to fulfill his obligation to resolve any ambiguity in the record that Dr. Georgiou's "vague" opinion may have created.  (R. 16 (referencing R. 553–54)). The ALJ did not specify which records she deemed "somewhat consistent" with Dr. Georgiou's opinion.  (R. 16).  Mr. White's recent psychiatric records, however, raise questions about Mr. White's mental status and RFC.  During his May 2018 Fedcap evaluation, Dr. Branker noted that Mr. White's most recent auditory hallucination telling "him to hurt people" had occurred three days prior.  (R. 961).  She also described his monosyllabic speaking, trouble with reading, writing, and understanding questions, limited sustained concentration and attention, borderline intellectual functioning, and maladaptive, angry, argumentative personality.  (R. 979–80).  At the same time, Dr. Garyali found Mr. White, uncooperative, argumentative, and angry, and her mental status examination noted his limited concentration, poor insight, limited judgment, and poor impulse control.  (R. 997–98).  During her August 1, 2018 examination, Ms. Cahn noted that Mr. White's speech was slowed and his affect was "guarded," and that Mr. White made conflicting statements about whether the Ablify medication was beneficial.  (R. 916).  Several

months later, during her January 12, 2019 examination, Ms. Pearlman noted that Mr. White's behavior remained guarded and his affect flat, and although he did not exhibit any delusions, she was unable to assess his insight or judgment.  (R. 920–21).  At the hearing, Mr. White testified that he "hear[d] voices often."  (R. 85).  Even Dr. Walker acknowledged that, in January 2018, Mr. White was hearing auditory hallucinations.  (R. 104).

Throughout his psychiatric history, Mr. White has been on Ablify (see R. 86, 385, 390, 397, 414, 415, 552, 563, 583, 586, 589), as well as other psychiatric medications (R. 317 (Olanzapine)), including one occasion where he had to be sedated with Haldol, Benadryl, and Ativan.  (R. 323). The historical records also reflect Mr. White's hospitalization on at least four occasions for multiple days for his psychiatric conditions, and his discharge from the Army for going AWOL, (R. 84–85, 104, 308–13, 335–39, 362–81, 387, 508, 531, 552–53, 997).

Mr. White's more recent records, combined with the historical records of his hospitalization and psychiatric treatment, present a picture of a person who, despite sometimes fluctuating symptoms, has nonetheless reported and outwardly manifested schizophrenic and bipolar disorders for his entire adult life.  Presented with these records that were consistent with, and not contradicted by, what she described as a "vague" opinion from Dr. Georgiou, "the ALJ should have sought clarification from Dr. Georgiou before rendering [her] decision as to [Mr. White's] RFC."  Madera v. Comm'r of Soc. Sec., No. 20-CV-1459 (PKC), 2021 WL 4480656, at *6 (E.D.N.Y. Sept. 30, 2021).  The ALJ's failure to resolve the ambiguities in Dr. Georgiou's opinion and fully develop the record on Mr. White's mental impairments, in particular, his ability to interact with others, "warrants vacating the ALJ's decision and remanding the case for further proceedings."  Id. at *7; see Lebby, 2022 WL 580983, at *6 (holding that "the ALJ's finding that

Dr. Georgiou's opinion was 'vague' and inconsistent required further action from the ALJ to develop the record, such as recontacting Dr. Georgiou for additional information"); <u>Merriman v. Comm'r of Soc. Sec.</u>, No. 14 Civ. 3510 (PGG) (HBP), 2015 WL 5472934, at *18 (S.D.N.Y. Sept. 17, 2015) (concluding "that the ALJ's rejection of [one-time examiner's] opinion, at least in part, without attempting to clarify gaps in the record constituted legal error and grounds for dismissal").

Fourth, the ALJ's wholesale endorsement of the opinion of Dr. Walker—who did not examine Mr. White—contemporaneous with his wholesale rejection of the opinion of Dr. Branker—who examined Mr. White on one occasion—and Ms. Pearlman and Ms. Cahn—who treated him regularly—was error. Of course, "an ALJ may rely on the opinion of a non-examining state agency consultant in disability claims," <u>Amber H. v. Saul</u>, No. 3:20-CV-490 (ATB), 2021 WL 2076219, at *5 (N.D.N.Y. May 24, 2021). But here, the ALJ credited Dr. Walker over the examining sources without adequately considering or explaining how Dr. Walker's "lack of familiarity with [Mr. White] or the entirety of the record evidence affected his opinion regarding [Mr. White's] functional abilities." <u>Amber H.</u>, 2021 WL 2076219, at *6. Courts are appropriately skeptical when "the greatest degree of persuasion was assigned to a non-examining state agency consultant's opinion, and the least was afforded to plaintiff's own treatment providers." <u>Id.</u> at *8; <u>see</u> <u>Lebby</u>, 2022 WL 580983, at *6 (explaining that "the fact that all examining experts were deemed unpersuasive created an obvious gap in the record that required further development"); <u>Ingrid T.G.</u>, 2022 WL 683034, at *8 (remanding where ALJ discounted treating physician's opinion because it was based on a short-term treatment history, but found persuasive opinions of two

experts who examined claimant once and state agency consultant who did conducted no examination).

This skepticism is warranted here, and the Court finds that the ALJ failed "to sufficiently explain the basis for adopting the state agency consultant's opinion, and rejecting the three other opinions of record suggesting that [Mr. White] suffered from more restrictive limitations." Amber H., 2021 WL 2076219, at *6.  Absent further explanation, the Court may only surmise how the ALJ reconciled Dr. Walker's opinion that Mr. White could "complete an ordinary work day and work week for simple tasks" with the far more restrictive findings of Mr. White's treating and consultative examiners.  (R. 14, 17).  See Amber H., 2021 WL 2076219, at *6 (explaining that "[w]ithout further explanation" of why the ALJ adopted the state agency consultant's opinion and rejected the three other examining physician's opinions of claimant's more restrictive limitations, "the court is left to surmise how the ALJ reconciled" the state agency consultant's opinion of the claimant's greater RFC).

###   B.  Mr. White's Credibility

Here, that ALJ determined that Mr. White's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in" the ALJ Decision." (R. 15). Because remand is necessary to address the errors in the ALJ's development of the record and analysis of the medical opinion evidence, the Court declines to reach a finding on Mr. White's additional argument challenging the ALJ's assessment of his credibility.  (ECF No. 15 at 25–26). See Jennifer E., 2020 WL 2059823, at *11 (where court remanded to address errors in ALJ's evaluation of medical opinion evidence, declining to reach claimant's additional arguments). On

remand, the ALJ should re-evaluate Mr. White's credibility in light of any evidence added to the record.  The Court also notes that to fulfill her duty to develop the record, the ALJ must not only "obtain a claimant's medical records and reports but also [] question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on [his] functional capacity."  Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 261 (S.D.N.Y. 2016) (internal citation omitted).  During the Hearing, the ALJ's questions about Mr. White's functional capacity were largely limited to situations in which he felt uncomfortable, his memory and concentration, his sleep, and his medications.  (R. 84–88).  Apart from a single question about auditory hallucinations (R. 85 ("do you also hear some voices sometimes?"), the ALJ asked no questions about how Mr. White's schizophrenia and bipolar disorder might impact his ability to function in the workplace.  The Court encourages the ALJ on remand to ask additional follow up questions "about any subjective complaints and the impact of" Mr. White's diagnosed and treated psychiatric "impairments on [his] functional capacity."  Craig, 218 F. Supp. 3d at 261 (citation omitted); see Madera, 2021 WL 4480656, at *7 (finding that "ALJ failed to probe or consider how Plaintiff's mental impairments impacted his RFC").

*       *       *

Given the gaps in the administrative record and the errors in the ALJ's evaluation of the evidence identified above, the Court cannot conclude that "substantial evidence" supports the ALJ Decision, and therefore, remand is appropriate for further development of the evidence.  See Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).

## V.    **CONCLUSION**

For the reasons set forth above, Mr. White's Motion is GRANTED, the Commissioner's Motion is DENIED, and the ALJ Decision is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Opinion and Order.

The Clerk of the Court is respectfully directed to close ECF Nos. 14 and 17.

Dated:      New York, New York
            March 30, 2022

                                    SO ORDERED.


                                    _____
                                    SARAH L. CAVE
                                    United States Magistrate Judge